# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Terron Bailey | ) | |
| c/o Attorney Joshua J. Brown | ) | Case No. |
| 3979 Main Street | ) | |
| Hilliard, OH 43026, | ) | Judge |
| Individually and as parent and natural | ) | |
| Guardian of his child "Jane Doe," | ) | Jury demand included |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Hilliard City Schools Board of Education | ) | |
| c/o Scott Scriven LLP. | ) | |
| 250 East Broad Street, Suite 900 | ) | |
| Columbus, OH 43215, | ) | |
| | ) | |
| Beth Murdoch, in her official capacity | ) | |
| as Board President for the Hilliard City | ) | |
| Schools Board of Education | ) | |
| c/o Scott Scriven LLP. | ) | |
| 250 East Broad Street, Suite 900 | ) | |
| Columbus, OH 43215, | ) | |
| | ) | |
| Kara Crowley, in her official capacity | ) ) | |
| as Vice President for the Hilliard City | ) | |
| Schools Board of Education | ) | |
| c/o Scott Scriven LLP. | ) | |
| 250 East Broad Street, Suite 900 | ) | |
| Columbus, OH 43215, | ) | |
| | ) | |
| Nadia Long, in her official capacity | ) | |
| as a Member of the Hilliard City Schools | ) | |
| Board of Education | ) | |
| c/o Scott Scriven LLP. | ) | |
| 250 East Broad Street, Suite 900 | ) | |
| Columbus, OH 43215, | ) | |
| | ) | |
| Zach Vorst, in his official capacity | ) | |

as a Member of the Hilliard City Schools )
Board of Education )
c/o Scott Scriven LLP. )
250 East Broad Street, Suite 900 )
Columbus, OH 43215, )
)
Brian Perry, in his official capacity )
as a Member the Hilliard City Schools )
Board of Education )
c/o Scott Scriven LLP. )
250 East Broad Street, Suite 900 )
Columbus, OH 43215, )
)
          Defendants. )

## VERIFIED COMPLAINT

For his Complaint against Defendant, Plaintiff states as follows:

### I.    PARTIES

1.    Terron Bailey is a resident of the Hilliard City School District. His child attends Hilliard City School District.

2.    Hilliard City School District is a local school district in Hilliard, Ohio ("District"). The District is a "local education agency" pursuant to 20 U.S.C. § 1232h(c)(6).

### II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1342, and to the extent applicable 1367 because this case involves the interpretation of a federal law (namely the First Amendment to the U.S. Constitution and 42 U.S.C. 1983), the effect of government agencies' interpretation of that law, and the Plaintiff's rights pursuant to that federal law.

4. Federal law affords this Court authority to grant Plaintiff's requested declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201. Also, see Fed. R. Civ. P. 57.

5. Plaintiff is unaware of any pending state litigation on these matters.

6. This Court should accept discretionary jurisdiction for a declaratory judgment because this case involves harms caused by Defendants in violating the constitutional right of Plaintiffs to free speech.

7. The case is ripe for review because, as this Complaint will show, the harms discussed below caused Plaintiff damages.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (d), because: 1) Plaintiff resides in this District; 2) Defendants' primary place of business is in this district; and 3) "a substantial part of the events or omissions giving rise to all Plaintiff's claim occurred" in this District.

### III. STATEMENT OF FACTS

9. Plaintiff Terron Bailey is the Father of a student at Hilliard Heritage Middle School (herein "Jane" or "Jane Doe").

10. On March 14, 2023, while Bailey was at work, he received a phone message from Vice Principal Nic Gaston, who works at Jane's school.

11. Gaston's message said that Jane "made a poor decision on social media," that Jane was upset, and Jane wanted to talk to her father.

12. Bailey was familiar with Gaston before this call. Jane complained to Bailey

multiple times about Gaston being rude, hostile, and unprofessional on multiple occasions. Bailey did not believe Jane when she told Bailey these things and gave Gaston benefit of the doubt, given his position with the school.

13.     After Bailey received the message, but before Bailey listened to the message, Bailey received a call from Jane from her cell phone.

14.     Jane informed Bailey that she made a social media post about a teacher. Bailey could hear Jane crying over the phone. Jane told Bailey the Vice Principal tried to call Bailey and the Vice Principal left a message on Bailey's phone. Jane suggested that she thought that the school was going to suspend her. Bailey attempted to calm her down and talk with her.

15.     Next, Bailey called the school. Bailey was dispatched into the Principal's office. Bailey was placed on a speakerphone with the Principal Joel Assenheimer and Vice Principal Gaston.

16.     Assenheimer explained that Jane made a social media post about a teacher, Ms. Geoit, and Jane was lip-syncing to audio, and the audio said "f*** you and f*** those kids." Assenheimer said the video had a caption saying, "When Ms. Geoit is in class talking about her dead babies."

17.     Assenheimer told Bailey that another student saw it on Jane's social media page and showed it to Ms. Geoit. Assenheimer told Bailey the teacher Geoit came to him, so upset about the post that she had to be sent home for the day.

18.     Assenheimer said that he and Gaston discussed the matter, and were

considering giving Jane a one day out-of-school suspension or a one to two-days in-school suspension.

19.     Assenheimer informed Bailey that the violation Jane was being punished for pursuant to the school's Code of Conduct, forbidding "general misconduct," "misuse of technology," and "disruption of school."

20.     Bailey expressed that he was not supportive of these punishments. Bailey explained that he would deal with it at home in a manner that would be strong enough to correct the behavior, but Bailey was uncomfortable with discipline that would affect Jane's academic and educational progress.

21.     Assenheimer informed Bailey that he would give Jane a three-day in-school suspension. Bailey agreed to the in-school suspension, because it minimized the effect on Jane's educational progress. At this time, it was Bailey's understanding that Jane's post was made and displayed at school, by Jane. Bailey agreed to the Principal's suggested suspension only because, at that time, Bailey thought it was an in-school disciplinary matter.

22.     When Bailey got home from work that evening, Bailey discussed the matter with Jane. Bailey learned that the post was made by Jane, at home, in her own time, and that she did not send it to anybody or display it at school.

23.     Jane had already expressed to Bailey, on multiple occasions throughout the schoolyear, that a teacher at her school was frequently discussing her personal pregnancy and adoption matters in class, and openly crying about her personal situation in this

- 5 -

eighth-grade classroom. Jane saw this discussion as inappropriate for the classroom and a distraction from learning in language arts. During this discussion with Jane, Bailey learned that the specific teacher was Ms. Geoit and that the post was referencing Geoit and Geoit's acts.

24.    After discussing the incident with her, Bailey downloaded Hilliard Heritage's student school Code of Conduct. Bailey read parts of the Code that the Principal said Jane violated. Bailey concluded that none of these policies were violated.

25.    Bailey visited the school the following morning, unannounced. Bailey brought Jane with him, who sat in the administrative office while Bailey went into an office with Vice Principal Nic Gaston. Jane informed Bailey that she did not feel comfortable being in the same room with Gaston.

26.    In the room, Gaston and Bailey began discussing Jane's post. Bailey began to explain to Gaston that Jane's post was a personal post, on her personal device, made at home, etc. Bailey was attempting to explain that the school has no authority to discipline someone for criticism of a public official that is done at home and not brought by the speaker into the school.

27.    About one minute and thirty seconds into Bailey's remarks, Gaston, rudely and abruptly cut Bailey off while Bailey was speaking. Gaston said, "I'm going to stop you right there" and slammed himself back into his chair, violently and intimidatingly. Gaston became red in the face and crossed his legs and arms.

28.    Because of the nature of Bailey's work (law enforcement) Bailey is not

emotionally sensitive to these types of acts. However, Bailey is highly-trained in interview and interrogation techniques with society's worst offenders. Bailey personally, and on a daily basis, interviews, and has interviewed, thousands of felony-level criminals, including murderers, gang members, and other violent offenders, for over ten years. Bailey also represents the State of Ohio in administrative hearings before parole boards on a regular basis.

29. Based on Bailey's training and experience, Bailey concluded that Gaston acted in an aggressive, intimidating, defensive manner, because Bailey was not agreeing with Gaston's characterization of the events, and Gaston wanted to physically and emotionally intimidate Bailey into adopting Gaston's point of view.

30. Gaston said, "I stand on my discipline, because I have a teacher who is messed up right now." Gaston explained that the teacher had to be sent home from school, had been out of school, and he was not sure when the teacher would return. Bailey interpreted that Gaston was defensive because of his concern for the teacher. Bailey did not and does not have a problem with Gaston's concern for the teacher.

31. Given his background and training, Bailey was able to remain calm throughout the meeting, despite Gaston's outburst. Bailey used techniques Bailey was trained on to use his body language and words to deescalate the situation, including asking him to explain his own emotional state. Gaston said, "I'm fine. But I am defensive and upset."

32. Bailey asked Gaston for an opportunity to finish his (Bailey's) remarks.

Gaston repeated that he had a "teacher who was messed up" and he was "concerned she can't be here at school."

33.     Principal Assenheimer walked into the room about this time. Gaston continued his mannerisms. Assenheimer clearly noticed that Gaston was highly emotional, making a facial gesture to suggest as much.

34.     The Principal then introduced himself to Bailey and asked how he could help Bailey today.

35.     Bailey explained to Assenheimer what Bailey had been explaining to Gaston. Bailey explained that Gaston's mannerisms were unprofessional up to this point.

36.     Bailey then began to discuss Jane's post with the principal, as noted above. In addition, Bailey noted that the code of conduct did not appear to support the punishment.

37.     Assenheimer explained that he felt it was a disruption of the school, even if it was not a violation of a specific rule. Bailey noted that Bailey disagreed.

38.     Bailey questioned whether the disruption arose from Jane's post or the teacher's handling of the situation in an unprofessional manner. Bailey also mentioned that a teacher discussing her personal pregnancy issues in a middle-school classroom was an invitation for criticism. Also, Jane did not bring the offensive post into school, another child brought it in and showed it to the teacher.

39.     At that point, Gaston interrupted Bailey, asking "what are you trying to say? Sometimes kids ask if a teacher has kids."

40.    Bailey answered that Geoit was not prompted or solicited into the disclosures about her personal pregnancy by students, but frequently volunteered this information in an emotional state, despite the fact that students found it unprofessional and it made them uncomfortable.

41.    Assenheimer reacted by saying that it is common for teachers to engage in such conversations, and gave a personal example.

42.    Bailey expressed that a professional eighth-grade teacher should know how to address her students and understand how eighth-grade students will react to hearing a teacher frequently, and emotionally discus her personal, intimate affairs.

43.    Assenheimer dismissed Gaston from the room, saying Gaston needed to escort children into the building. However, Bailey suspected Assenheimer detected that the conversation was poisoned by Gaston's mannerisms.

44.    Gaston made a rude, hostile, unprofessional gesture on his way out of the room.

45.    At this time, Bailey recalled the descriptions of Gaston's behavior that Jane gave Bailey previously. Bailey felt Jane's descriptions were now validated and Bailey felt bad that Bailey did not believe her before. Gaston's behavior was perfectly consistent with Jane's previous descriptions.

46.    Assenheimer apologized for Gaston's behavior. Assenheimer agreed with Bailey's thoughts about teachers knowing what is inappropriate to discuss with middle-school children, but disagreed on the appropriate discipline. Assenheimer chose to

reduce Jane's in-school suspension to two days.

47.    Assenheimer agreed to hold a meeting with himself, Jane, the teacher Geoit, and the school's social worker.

48.    That meeting was supposed to take place the following Friday, March 17, 2023.

49.    Assenheimer called Bailey that day and said, after a discussion with the social worker and Geoit, he felt Bailey should not be at the meeting because the teacher would be uncomfortable. Assenheimer told Bailey that Geoit wanted to speak one-on-one with Jane only, with nobody else in the room.

50.    Bailey told Assenheimer he was not comfortable with a meeting that included Gaston, due to the previous behavior of Gaston. Bailey suggested that Jane could record the conversation. Assenheimer did not agree that recording would be a good idea.

51.    Bailey rejected the idea of the teacher meeting one-on-one with Jane, because Assenheimer failed to explain why the teacher would be uncomfortable with Bailey and other staff being in the room.

52.    Bailey asked why it would be uncomfortable for Geoit with Bailey in the room?

53.    Assenheimer said, "I really can't tell you, other than I'm working on it, but at this time she's not comfortable with it, and I'm asking you to trust me."

54.    Bailey asked again, why the teacher would be uncomfortable with Bailey in

the room.

55.     Again, Assenheimer said he was not sure, but he was working hard to make the meeting happen.

56.     Assenheimer said he would call Bailey the following week to sort it out.

57.     Assenheimer did call Bailey the following week. At this time, Jane had finished the punishment levied against her. He suggested that Jane could go to a different class. Bailey suggested that this could be interpreted as another punishment of Jane.

58.     The school did remove Jane from her class. However, at first, she spent the time for that class in the administrative officer, rather than another class. This totaled six (6) days out of class.

59.     On Wednesday March 23, 2023, Jane was still not allowed into her class. Bailey sent an email asking  a number of questions.

60.     Assenheimer called Bailey later, after the end of the school-day, and left a message. The message said he received the email and that he was sure he could make the meeting happen now. He said he was frustrated that the problem escalated this far and agreed the child should be in class. Assenheimer said he did not know why the teacher Geoit did not trust him. Assenheimer sent Bailey a return email late that night, which confirmed that the meeting was to occur 1:00 p.m. the next day.

61.     Bailey arrived for the meeting about 1:00 p.m. the next day. The Principal informed Bailey that he was uncomfortable with having the meeting because Bailey posted his grievances on a social media page.

62.    Bailey told Assenheimer that he (Bailey) felt he was forced to accept moving Jane to another class.

63.    The promised meeting never happened.

**COUNT ONE:**
**FIRST AMENDMENT TO THE  UNITED STATES CONSTITUTION:**
**FREEDOM OF SPEECH**
**(42 U.S.C. § 1983)**

64.     Plaintiffs incorporates the preceding, as if fully restated herein.

65.    The First Amendment to the Constitution of the United States includes a clause granting freedom of speech to all citizens. It prohibits censorship or punishment for protected expression. It is incorporated and made applicable to the states by the Fourteenth Amendment.

66.    Article I, Section 11 of the Ohio Constitution grants similar rights under Ohio law.

67.    Non-disruptive speech is protected speech under the First Amendment and Article I, Section 11.

68.    Jane's speech is protected speech under both the Ohio and United States Constitutions.

69.    The United States has "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280, 84

S.Ct. 710 (1964) citing: *Terminiello v. Chicago*, 337 U. S. 1, 337 U. S. 4; *De Jonge v. Oregon*, 299 U. S. 353).

70.     Jane's expression—criticizing a public official for her unprofessional behavior in executing her job—did not and does not materially and substantially interfere with the orderly conduct of educational activity. Jane did not make any statements at the school or bring in copies of the statement into the school. Jane is not the one who made it an issue known by more than a few people at the school.

71.     The messages Jane expressed are exclusively Jane's private expression and are not school-sponsored speech.

72.     However, Defendant singled out Jane's expression and punished her for it.

73.     Viewpoint-based restrictions on speech in a public forum are presumptively unconstitutional and are subject to strict scrutiny.

74.     Time, place, and manner restrictions on speech must be content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. Time, place, and manner restrictions cannot be levied upon a person's remarks made in her own home.

75.     Defendant's punishment of Jane suppresses and chills her right to criticize a public official.

76.     Defendants expressly interpret their policy in a viewpoint-discriminatory manner, evidenced by the fact that they permit expression that praises school officials.

77.     Even if Jane made her remarks at school, Defendants' unequal treatment of

Jane's expression is also a content-based restriction of her speech in an otherwise open forum.

78.     Defendant's policy and practice also impose an unconstitutional heckler's veto because they permit the restriction of protected student expression merely because the school officials deem the student's expression offensive.

79.     Prior restraints on speech may not delegate overly broad discretion to government decision-makers, may not allow for content-based restrictions, must further a compelling government interest, must be narrowly tailored, and must be the least restrictive means available.

80.     Defendants' policy and practice impose an unconstitutional prior restraint because they vest the school officials with unbridled discretion to permit or deny student expression, outside of the school itself. This permits content and viewpoint-based enforcement of the policies.

81.     Defendants' policy and practice give unbridled discretion to school officials by permitting them to forbid messages, outside of school, that they deem to be offensive.

82.     Defendants' policy and practice is overly broad because they restrict student speech that does not and will not materially disrupt the educational process.

83.     This overbreadth chills the speech of students who wish to levy criticism of public officials.

84.     Defendants' policy and practice has no compelling or legitimate reason that would justify their censorship of the message that Jane seeks to express.

85.     Defendants' policy and practice are not the least restrictive means of achieving any compelling interest they may allege.

86.     Defendants' policy and practice are not reasonably related to any legitimate pedagogical concerns.

87.     Censoring students' protected speech per se is not and cannot be a legitimate pedagogical concern.

88.     Due to the actions of the Defendants, Plaintiff has been harmed by the deprivation of her constitutional rights.

## COUNT TWO:
## FOURTEENTH AMENDMENT: DUE PROCESS
## (42 U.S.C. § 1983)

89.     Plaintiff incorporates the preceding as if fully restated herein.

90.     The Due Process Clause of the Fourteenth Amendment prohibits the government from censoring speech pursuant to vague standards that grant enforcement officials unbridled discretion.

91.     The arbitrary determination by school officials of what is and is not offensive violates this rule.

92.     Students of common intelligence must guess as to whether their expression will be deemed offensive, and thus, subject to censorship and punishment.

93.     Defendants' policy and practice of punishing students for criticizing teachers off-campus, are vague and allow for unbridled discretion in determining which student speech is permissible.

94.     Due to the Defendants' actions, Plaintiff was harmed because his child was deprived of constitutional rights.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and provide Plaintiff with the following relief:

A.      That this Court issues a Preliminary and Permanent Injunction enjoining Defendants, their official, agents, employees, and all persons in active concert or participation with them, from enforcing Defendants' policies challenged herein both facially and as-applied so as to prohibit Jane from expressing her criticism of public officials off-campus;

B.      That this Court render a Declaratory Judgment, declaring Defendants' policy and practice of prohibiting criticism of teachers off-campus as a punishable offense, unconstitutional and as-applied to Jane's speech;

C.      That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy in order that such declarations shall have the force and effect of final judgment;

D.      That this Court retain jurisdiction of this matter for the purpose of enforcing this Court's order;

E.      That this Court grant an award of actual damages against Defendants in an amount this Court deems appropriate;

F.      That this Court grant to Plaintiff reasonable costs and expenses of this

action, including attorney's fees in accordance with 42 U.S.C. § 1988;

G.     That this Court grant requested injunctive relief without a condition of bond or other security being required of Plaintiff;

H.     That this Court grant such other relief as the Court deems appropriate.

Plaintiff demands a trial by jury.

June 26, 2023                                    Respectfully Submitted,

                                                /s/ Joshua J. Brown
                                                Joshua J. Brown (0089836)
                                                Attorney at Law
                                                3979 Main Street
                                                Hilliard, OH 43026
                                                P: (614) 284-4394
                                                F: (614) 388-3947
                                                josh@joshbrownesq.com
                                                Attorney for Plaintiff

IN THE UNITED STATES COURT
FOR THE SOUTHERN DISTRICT OF OHIO

Terron Bailey,                          :
Individually and as parent and          :      Case No.
natural guardian of his child,          :
                                        :      Judge
            Plaintiffs,                 :
                                        :
      v.                                :
                                        :
Hilliard City School District, et al.,  :
                                        :
            Defendant.                  :

### AFFIDAVIT IN SUPPORT OF COMPLAINT

State of Ohio          )
                       ) SS:
County of Franklin     )

I, Terron Bailey, Plaintiff in the above-captioned case, after being duly cautioned and sworn, upon personal knowledge or information, hereby avers as follows:

1.     I am an adult over the age of eighteen (18).

2.     I am competent to testify as to the matters set forth in this affidavit, and I have been advised by my legal counsel of the consequences of testifying falsely.

3.     I offer the following testimony on personal knowledge.

4.     I am the Father of a student at Hilliard Heritage Middle School.

5.     On March 14, 2023, while I was at work, I received a phone message from Vice Principle Nic Gaston, who works at my child's school.

6.     Gaston's message said that my child "made a poor decision on social media," that my child was upset, and my child wanted to talk to me.

7.     I was familiar with Gaston before this call. My child complained to me

multiple times about Gaston being rude, hostile, and unprofessional on multiple occasions. I did not believe my child when she told me these things and gave Gaston benefit of the doubt, given his position with the school.

8. After I received the message, but before I listened to the message, I received a call from my child from her cell phone.

9. My child informed me that she made a social media post about a teacher. I could hear my child crying over the phone. She told me the Vice Principle tried to call me and he left a message. She suggested she thought that the school was going to suspend her. I attempted to calm her down and talk with her.

10. Next, I called the school. I was dispatched into the Principle's office. I was placed on a speakerphone with the Principle Joel Assenheimer and Vice Principle Gaston.

11. Assenheimer explained that my child made a social media post about a teacher, Ms. Geoit, and my child was lip-syncing to audio, and the audio said "f you and f those kids." Assenheimer said the video had a caption saying "When Ms. Geoit is in class talking about her dead babies."

12. Assenheimer told me that another student saw it on my child's social media page and showed it to Ms. Geoit. Assenheimer told me the teacher Ms. Geoit came to him, so upset about the post that she had to be sent home for the day.

13. Assenheimer said that he and Gaston discussed the matter, and were considering giving my child a one day out-of-school suspension or a one or two-days in-school suspension.

14. Assenheimer informed me that the violation my child was being punished for was "general misconduct," misuse of technology," and "disruption of school."

15. I expressed that I was not supportive of these punishments. I explained that I would deal with it at home in a manner that would be strong enough to correct the behavior, but I was uncomfortable with discipline that would affect her academic and educational progress.

16. Assenheimer informed me that he would give my child a three-day in-school suspension. I agreed to the in-school suspension, because it minimized the effect on my daughter's educational progress.

17.     At this time, it was my understanding that my child's post was made and displayed at school, by my child. I agreed to the Principle's suggested suspension only because, at that time, I thought it was an in-school disciplinary matter.

18.     When I got home from work that evening, I discussed the matter with my daughter. I learned that the post was made by my child, at home, in her own time, and that she did not send it to any body or display it anywhere except on her own social media page.

19.     My child had already expressed to me, on multiple occasions throughout the school-year, that a teacher at her school was frequently discussing her personal pregnancy and adoption matters in class, and openly crying about her personal situation in class. My child saw this discussion as inappropriate for the classroom and a distraction from learning in language arts. During this discussion with my child, I learned that the specific teacher was Mr. Geoit and that the post was referencing Geoit and Geoit's acts.

20.     After discussing the incident with her, I downloaded Hilliard Heritage's student school code of conduct. I read parts that pertained to what the rules the principle said my child violated. I concluded that none of these policies were violated.

21.     I visited the school the following morning, unannounced. I brought my child with me, who sat in the administrative office while I went into an office with Vice Principle Nic Gaston. My child informed me that she did not feel comfortable being in the same room with Gaston.

22.     In the room, Gaston and I began discussing the post. I began to explain to Gaston that my child's post was a personal post, on her personal device, made at home, etc. I was attempting to explain that the school has no authority to discipline someone for criticism of a teacher that is done at home and not brought by the speaker into the school.

23.     About one minute and thirty seconds into my remarks, Gaston, rudely and abruptly cut me off while I was speaking. Gaston said, "I'm going to stop you right there" and slammed himself back into his chair, violently and intimidatingly. He became red in the face. He crossed his legs and arms.

24.     Because of the nature of my work (law enforcement) I am not emotionally sensitive to these types of acts. However, I have training in interview and interrogation techniques. I personally, daily interview, and have interviewed thousands of felony-level criminals, including murderers, gang members, and other violent offenders, for over ten years. I also represent the State of Ohio in administrative hearings before parole boards on

a regular basis.

25.     Based on my training and experience, I concluded that Gaston acted in an aggressive, intimidating, defensive manner, because I was not agreeing with his characterization of the events, and he wanted to physically and emotionally intimidate me into adopting his point of view.

26.     Gaston said, "I stand on my discipline, because I have a teacher who is messed up right now." Gaston explained that the teacher had to be sent home from school, had been out of school, and he was not sure when the teacher would return. I interpreted that Gaston was defensive because of his concern for the teacher. I did not and do not have a problem with his concern for the teacher.

27.     Given my background and training, I was able to remain calm throughout the meeting, despite Gaston's outburst. I used techniques I was trained on to use my body language and words to deescalate the situation, including asking him to explain his own emotional state. Gaston said, "I'm fine. But I am defensive and upset."

28.     I asked Gaston for an opportunity to finish my remarks. Gaston repeated that he had a "teacher who was messed up" and he was "concerned she can't be here at school."

29.     The Principle Assenheimer walked into the room about this time. Gaston continued his mannerisms. Assenheimer clearly noticed that Gaston was highly emotional, making a facial gesture to suggest as much.

30.     The Principle then introduced himself to me and asked how he could help me today.

31.     I explained to Assenheimer what I had been explaining to Gaston. I explained that Gaston's mannerisms were unprofessional up to this point.

32.     I then began to discuss my child's post with the principal, as noted above. In addition, I noted that the code of conduct did not appear to support the punishment.

33.     Assenheimer explained that he felt it was a disruption of the school. I noted that I disagreed. He narrowed his view down to say that it was a disruption of the eighth-grade class.

34.     I questioned whether the disruption arose from my child's post or the teacher's handling of the situation in an unprofessional manner. I also mentioned that a

teacher discussing her personal pregnancy issues in a middle-school classroom was an invitation for criticism. Also, my child did not bring the offensive post into school, another child brought it in and showed it to the teacher.

35.     At that point, Gaston interrupted me, asking "what are you trying to say? Sometimes kids ask if a teacher has kids."

36.     I answered that Geoit was not prompted or solicited into the disclosures about her personal pregnancy by students, but frequently volunteered this information in an emotional state, despite the fact that students found it unprofessional and it made them uncomfortable.

37.     Assenheimer reacted by saying that it is common for teachers to engage in such conversations, and gave a personal example.

38.     I expressed that a professional eighth-grade teacher should know how to address her students and understand how eight-grade students will react to hearing a teacher frequently, and emotionally discus her personal, intimate affairs.

39.     Assenheimer dismissed Gaston from the room, saying Gaston needed to escort children into the building. However, I suspected Assenheimer detected that the conversation was poisoned by Gaston's mannerisms.

40.     Gaston made a rude, hostile, unprofessional gesture on his way out of the room.

41.     At this time, I recalled the descriptions of Gaston's behavior that my child gave me previously. I felt my child's descriptions were now validated and I felt bad that I did not believe her before. Gaston's behavior was perfectly consistent with my child's previous descriptions.

42.     Assenheimer apologized for Gaston's behavior. Assenheimer agreed with my thoughts about teachers knowing what is inappropriate to discuss with middle-school children, but disagreed on the appropriate discipline. Assenheimer chose to reduce my child's in-school suspension to two days.

43.     Assenheimer agreed to hold a meeting with himself, my child, the teacher Geoit, and the school's social worker.

44.     That meeting was supposed to take place the following Friday, March 17,

2023.

45.     Assenheimer called me that day and said, after a discussion with the social worker and Geoit, he felt I should not be at the meeting because the teacher would be uncomfortable. Assenheimer told me that Geoit wanted to speak one-on-one with my child only, with nobody else in the room.

46.     I told him I was not comfortable with a meeting that included Gaston, due to the previous behavior of Gaston. I suggested that my child could record the conversation. Assenheimer did not agree that recording would be a good idea.

47.     I rejected the idea of the teacher meeting one-on-one with my child, because Assenheimer failed to explain why the teacher would be uncomfortable with me and other staff being in the room.

48.     I asked why it would be uncomfortable for Geoit with me in the room?

49.     Assenheimer said "I really can't tell you, other than I'm working on it, but at this time she's not comfortable with it, and I'm asking you to trust me."

50.     I asked why the teacher would be uncomfortable with me in the room.

51.     Again, Assenheimer said he was not sure, but he was working hard to make the meeting happen.

52.     Assenheimer said he would call me the following week to sort it out.

53.     Assenheimer did call me the following week. At this time, my child had finished the punishment levied against her. He suggested that my child could go to a different class. I suggested that could be interpreted as another punishment of my child.

54.     The school did move my child from her class. However, at first, she spent the time for that class in the administrative officer, rather than another class. This totaled six (6) days out of class.

55.     On Wednesday March 23, 2023, my child was still not allowed into her class. I sent an email asking a number of questions. Exhibit A.

56.     Assenheimer called me later, after the end of the school-day, and left a message. The message said he received the email and that he was sure he could make the

meeting happen now. He said he was frustrated that the problem escalated this far and agreed the child should be in class. He said he did not know why the teacher Geoit did not trust him. Assenheimer sent me a return email late that night, which confirmed that the meeting was to occur 1p.m. the next day.

57.    I arrived for the meeting about 1p.m. the next day. The Principle informed me that he was uncomfortable with having the meeting because I posted my grievances on a social media page. Exhibit B.

58.    I told Assenheimer that I felt I was forced to accept moving my child to another class.

59.    The meeting never happened.

By signing this affidavit, I acknowledge that all the statements contained herein are true, complete, and accurate to the best of my knowledge and that the Court may rely on the truth of each of these statements. I have consulted with legal counsel about this statement and I understand that I am signing under penalty of perjury.

FURTHER AFFIANT SAYETH NOT

Date: 4-17-23

Terron Bailey
Individually and as parent and
natural guardian of his child

Subscribed and sworn to before me this _____17th_____ day of

_____April 2023_____

Date: April 17, 2023

Notary

My Commission expires: _____N/A_____